# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIO JULIETA, aka ULYSES SANDOVAL BELTRAN,<br><br>                        Petitioner,<br><br>v.<br><br>F. FRAUENHEIM, Warden,<br><br>                        Respondent. | Case No.:  16cv0987-BTM (BGS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Julio Julieta, aka Ulyses Sandoval Beltran, is a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  He challenges his March 15, 2013 San Diego County Superior Court convictions for assault with a firearm, torture, two counts of forcible rape, and one count of forcible sodomy, accompanied by firearm use and bodily injury sentence enhancements.  (Id. at 1, 7.)  The Petition contains six claims, the first three of which have been dismissed as moot. (ECF No. 15.)  The remaining claims allege that the imposition of consecutive sentences on the two rape counts violates state law (claim four), the cumulative effect of errors in the jury instructions on two kidnapping counts on which Petitioner was acquitted resulted in an unfair trial (claim five), and denial of access to the victim's sealed immigration records, which the state trial and appellate courts reviewed in camera, violated his right to a record adequate to permit meaningful appellate review (claim six).  (ECF No. 1 at 32-43.)

Respondent has filed an Answer and lodged the state court record. (ECF Nos. 9, 18-19.) Respondent contends that: (1) all claims are without merit; (2) claims four and six are not cognizable on federal habeas because they rely on state law only, and to the extent they raise federal issues state court remedies have not been exhausted; (3) relief was granted in the state court with respect to the jury instruction errors underlying claim five, rendering any relief here unnecessary; and (4) relief on claim six is barred by Teague v. Lane, 489 U.S. 288 (1989), and any federal error on that claim is in any case harmless. (ECF No. 18 at 10-16.) Petitioner has not filed a Traverse.

As set forth herein, the Court finds that Petitioner is not entitled to federal habeas relief because he has not demonstrated a federal constitutional violation in any respect. The Court therefore recommends the Petition be denied.

## I.      STATE PROCEDURAL BACKGROUND

In a nine-count Information filed in the San Diego County Superior Court on April 10, 2012, Petitioner was charged with kidnapping for ransom (count one), kidnapping for rape (count two), assault with a firearm (count three), torture (count four), three counts of forcible rape (counts five, six and eight) and two counts of sodomy by use of force (counts seven and nine). (Lodgment No. 1, Clerk's Transcript ["CT"] at 16-24.) As to all counts other than count four it was alleged Petitioner personally used a handgun and personally inflicted great bodily injury, and as to the rape and sodomy counts it was alleged that he substantially increased the risk of harm by kidnapping the victim. (Id.) On March 15, 2013, a jury found him not guilty on counts two, eight and nine, guilty on all remaining counts, and found the enhancement allegations true. (CT 723-37.) On August 16, 2013, he was sentenced to life in prison on count one, consecutive terms of twenty-five years to life each on counts five and six, and consecutive terms of 40 years on the enhancements on counts five and six, with sentences stayed on the remaining counts. (CT 743-45.)

Petitioner appealed, alleging, as he does here, there was insufficient evidence to support the kidnapping for ransom conviction (claim one), the court failed to instruct on lesser included offenses of kidnapping (claim two), the jury instructions omitted an element

of kidnapping for ransom (claim three), imposition of consecutive sentences on counts five and six violated state law (claim four), the cumulative effect of instructional errors on the kidnapping counts resulted in an unfair trial (claim five), and the failure of the trial court to disclose to the defense attorney-client privileged documents contained in the file of an immigration advocacy group which assisted the victim, which it reviewed in camera and sealed, prevented meaningful appellate review (claim six).  (ECF No. 9, attach. # 7.)  The appellate court: (1) granted relief on claim one because insufficient evidence was presented at trial to support the kidnapping for ransom conviction, remanded with instructions to enter a judgment of acquittal on that count, and found it unnecessary to reach the merits of claims two and three alleging instructional error on kidnapping, (2) rejected claim four on the basis that consecutive sentences were appropriate as the rapes occurred on separate occasions, (3) rejected claim five because there could be no cumulative prejudicial error arising from jury instructional error on the kidnapping counts on which Petitioner was acquitted, and (4) denied claim six after reviewing in camera the documents sealed by the trial court and finding they did not contain discoverable material and that the trial court did not abuse its discretion in refusing to disclose them to the defense.  (ECF No. 9, attach. # 10, People v. Beltran, No. D064469, slip op. (Cal.App.Ct. Jan. 12, 2015).)  Petitioner was later resentenced to 50 years to life on the two rape convictions plus 30 years in enhancements on those counts, with sentences on the remaining counts stayed.  (ECF No. 9, attachs. # 13-14.)

On February 25, 2015, Petitioner filed a pro se petition for review in the California Supreme Court in which he raised the same claims presented here and on direct appeal. (ECF No. 9, attach. # 11.)  That petition was summarily denied.  (ECF No. 9, attach. # 12, People v. Beltran, No. S224692, order (April 22, 2015).)

## II.    **TRIAL PROCEEDINGS**

Guadalupe M. testified that she first met Petitioner at a dance hall in 1999, when she was 24 years old, that she had a lot to drink that night and ended up at a house with Petitioner and several of their friends.  (Lodgment No. 2, Reporter's Tr. ["RT"] at 136-38.)

She fell asleep in a bedroom and awoke with Petitioner next to her on the bed, and although she asked him to leave her alone, he had nonconsensual sexual intercourse with her. (RT 138.) She did not want to see Petitioner again, but he called her and they met at her house about a month and a half after their first meeting and had consensual sexual intercourse. (RT 139-42.) They met again sometime later at a barbecue at the house of an acquaintance, where Petitioner forced her into his car, told her in a very forceful voice he wanted to have sex, and attempted to take her clothes off, but she resisted and they did not have sex. (RT 142-43.) Sometime after that last incident Guadalupe began dating Petitioner's cousin Jesus Sandoval, and they had a son together in 2002. (RT 146-48.) When Petitioner found out she was involved with his cousin, he called her from Mexico, accused her of "whoring around," and threatened her, telling her "to be very careful because he was going to come back one day." (RT 146-47.)

In 2004, Guadalupe was living in an apartment in San Ysidro with her brother Giovanni M. and his girlfriend Marisela Rodriguez. (RT 157, 159, 167.) On October 18, 2004, around 3:00 a.m., she was feeding her baby when Marisela came to her bedroom door and said Guadalupe's brother-in-law Jorge Sandoval was there and wanted to speak to her. (RT 157-58.) Jorge told Guadalupe that Petitioner wanted to speak to her and pointed to Petitioner, who was in the living room. (RT 158-59.) She was surprised and scared, as she had not seen Petitioner since 2000. (RT 159.) When Petitioner said "we have to talk," she replied "let's talk," and he said "but let's go outside." (RT 159.) She refused and Petitioner pulled out a handgun, grabbed her and forced her outside. (RT 159-61.) Jorge tried to convince Petitioner to stop, but Petitioner held a gun to Guadalupe's head and forced her to walk barefoot to a black truck. (RT 161, 170-74.) There were two other men in the truck, including one she knew as Chino, who drove for 15 minutes as Petitioner held the gun to her head and forced her head down so she could not see. (RT 182-83, 185-89.) When they stopped, her face was covered and she was taken inside a house. (RT 188-89.) There were three people in the house, including a man named Tony whom Guadalupe knew. (RT 190.)

4

Inside the house Petitioner asked Guadalupe about a man named Chilacas, a very good friend of Jesus Sandoval, the father of her child. (RT 181, 191.) Guadalupe said Petitioner was "very violent. He was drunk. He was like drugged," and told her Chilacas owed him money. (RT 192.) When she told Petitioner she did not know anything about Chilacas he hit her in the face very hard. (RT 192-93.) Tony and a man they called Cholo then tied her hands and feet with tape, and Petitioner "ordered for some pliers to be brought in to pull out my nails." (RT 194-95.) She knelt on the floor as Petitioner sat in a chair and ordered her to put her hands on his legs. (RT 196.) Cholo used the pliers to try to pull out her fingernails as she begged Petitioner to stop. (RT 196-97.) Petitioner ordered Tony to take her into another room, where they asked her again where they could find Chilacas, and where they terrorized her with a gun and a knife. (RT 197-204.)

Petitioner ordered the men to leave the room and, while holding a gun in his hand, removed Guadalupe's clothes. (RT 205-06.) She tried to resist but he was too big and strong. (Id.) Petitioner bit and scratched her as he had anal and vaginal intercourse with against her wishes, while he continued to mock and threaten her. (RT 206-12.) Petitioner fell asleep on her legs, and when he awoke he took her into the kitchen and ordered her to clean it and cook for the men, which she did after someone went to a store for groceries. (RT 215-17.) Sometime thereafter, Petitioner took Guadalupe back to the bedroom and forced her to engage in anal and vaginal intercourse again, which was even more painful than the first time. (RT 225-26.)

When Petitioner finally left her alone at dawn, Guadalupe found clothing which did not belong to her and went to clean herself in the bathroom. (RT 230-31.) She was bleeding from her anus and took a shower. (RT 231-32.) Petitioner forced her at gunpoint to call her house, say she was fine, and tell her roommates not to call the police and that she would be home soon. (RT 233-34.) Petitioner ordered two men to take her home, and before she left he told her "to excuse him, to forgive him, that he didn't want to harm me and not to make a report with the police. And if I did it, he said that San Diego was a very small place." (RT 235.) Her face was covered and she was driven home. (RT 236-37.)

16cv0987-BTM (BGS)

She called the police when she got home and they took her to a hospital. (RT 245-47.) The next and last time she heard from Petitioner was when he called her in 2009 or 2010, even though she had changed her telephone number. (RT 267-68.) She was scared and they spoke for two or three minutes before she hung up on him. (RT 268.)

Guadalupe admitted she had crossed into the United States from Mexico in August 1999 using a counterfeit passport. (RT 148.) She admitted being deported after being convicted of possession of drugs for sale in 2002, and admitted having been deported several times and each time illegally returning to the United States. (RT 150-51.) She denied receiving any payment or benefits for testifying, although she said that when she reported the incident in 2004 the police provided her with paperwork requesting permission to stay in California, but she was told about four months later that "nothing could be done." (RT 283-86.) Guadalupe did nothing else about her immigration status until October 2012, immediately after a meeting with Detective Esmeralda Tagaban, who made an appointment for Guadalupe at the Casa Cornelia Law Center to assist her with a visa application, but they were unable to assist her. (RT 286-87, 333-34, 371-74.) As a result of that referral she had an upcoming appointment with a similar organization to seek immigration assistance. (RT 333-34, 374.)

Defense counsel moved for a mistrial on the basis that the discovery provided by the prosecutor did not disclose that the police had assisted Guadalupe in a visa application in 2004, which the defense argued was a benefit for her cooperation with the police. (RT 292-315.) The prosecutor responded that although she had disclosed to the defense that the police assisted Guadalupe with her 2011 visa application around the time of the preliminary hearing, the first time the prosecutor had heard the police had assisted her in a 2004 visa application was during Guadalupe's trial testimony. (Id.) The trial judge denied the mistrial motion, indicated that Guadalupe may have confused the 2004 and 2011 dates, and allowed the defense to cross-examine her on the issue. (RT 315-16.)

On cross-examination Guadalupe said that on October 18, 2004, the day of the incident, she spoke with a Spanish-speaking police officer whose name she did not recall

but who took her statement and translated for her with a nurse. (RT 324-25.) The next day she spoke with Detective Serrano, whom she remembered well, and two days later spoke with a group of people in the office of the San Diego District Attorney. (RT 326.) After that second interview a police detective provided her with information about a U-visa, the first time she learned of such a procedure, which she understood permits crime victims to remain in the United States. (RT 382, 446-47.) She admitted that she wanted to stay in the United States, and understood that she would have to prove she was a crime victim to obtain a U-visa, but said she did not know if Petitioner had to be convicted to obtain the visa. (RT 383-85, 391.) She said that before Petitioner abducted and raped her she did not know what a U-visa was, and as of the date of her testimony she had not been granted one. (RT 442, 456.) The trial judge reviewed in camera, and sealed for purposes of appellate review, attorney-client privileged documents from the Casa Cornelia Law Center. (RT 381, 409.) The trial judge ruled that based on his in camera review of those sealed documents, the defense was already in possession of most of the documents, and the remainder were collateral and would not provide assistance to the defense, in particular with respect to their contention that Guadalupe had received a benefit from law enforcement involvement in her attempt to obtain a U-visa. (RT 502-03.) Prior to trial the judge had reviewed Guadalupe's immigration file, which was obtained by the prosecution from the federal government and provided to the defense, and stated that it did not contain a reference to a U-visa. (RT 44-45.)

Marisela Rodriguez testified that she and her ex-husband Giovanni M. lived with Giovanni's sister Guadalupe M. for three months and never saw Petitioner come to their apartment. (RT 459-61, 489.) On October 18, 2004, about 4:00 a.m., the doorbell rang, and when she looked through the peephole she saw only one person, Jorge Sandoval. (RT 462-63.) Guadalupe came from her bedroom, and when Marisela said it was Jorge, Guadalupe told her to open the door. (RT 463.) Petitioner, who was not visible through the peephole, entered with Jorge as Marisela went back to her bedroom. (RT 464-67.) Marisela heard Guadalupe talking to the men in a whisper, which soon changed to a scared

voice saying "let me go." (RT 467.) Marisela was scared and stayed in her bedroom, but Giovanni left the bedroom and went into the living room. (RT 467-68.) Marisela went to the window and saw Guadalupe being taken away with Petitioner holding a gun to her head. (RT 472-73.) Marisela insisted that Giovanni call the police, but the police were not called until Guadalupe returned later that day because Jorge had told them not to call the police and that she would be fine and would be back. (RT 474.) When Guadalupe returned later that afternoon she was wearing different clothes, crying, walking very slowly, her face and neck were bruised, she was in pain, particularly when she sat down, and said Petitioner had raped her. (RT 480-81, 484-85, 500.)

Giovanni M. testified that on October 18, 2004, he had been living for a short time with his sister Guadalupe and his wife Marisela. (RT 517-18.) He had previously lived with Guadalupe and her boyfriend Jesus Sandoval. (RT 518.) In the early morning hours of October 18, Giovanni came out of his bedroom and saw Petitioner and Jorge Sandoval, Jesus's brother, in the living room telling Guadalupe to "calm down." (RT 519-23.) Giovanni saw Petitioner take Guadalupe from the house at gunpoint to a black truck, and Giovanni told Jorge he was going to call the police. (RT 522-31.) Jorge told him nothing was going to happen to Guadalupe, and Giovanni believed him because he was a friend of the family, as Jorge's brother had been Guadalupe's boyfriend, and Jorge had been the boyfriend of Giovanni's other sister. (RT 531-32.) Guadalupe called later and said she was okay, but when she returned she was crying, had bruises on her arms and neck, and glue on her arms left by adhesive tape. (RT 533-35.)

Jorge Carranza, a San Diego Police Officer, testified that he responded to a report of a rape on October 18, 2004, and took a statement from Guadalupe, who was unkempt with fresh bruises, and had adhesive residue on her forearms. (RT 575-77.) Her statement to Officer Carranza was consistent with her trial testimony. (RT 578-614.) He said he did not give her information about a U-visa, and did not know what one was. (RT 1121.)

Stacia Mesleh, a Sexual Assault Nurse Examiner, examined Guadalupe on October 18, 2004 and documented her injuries, which were consistent with Guadalupe's testimony

regarding her injuries. (RT 1127-94.) Petitioner's DNA was found in semen recovered from Guadalupe's anus and vagina. (RT 1164-65, 1278, 1312-22, 1324-30.)

John Serrano, a San Diego County District Attorney Investigator, testified that he interviewed Giovanni and Marisela on October 19, 2004, and interviewed Guadalupe the following day with a District Attorney present. (RT 1250-54.) He arranged for Guadalupe to meet with a private advocate group on October 25, 2004, to provide her with support and resources, such a counseling, but did not remember if he discussed a U-visa with her. (RT 1255-56.) He did not offer or provide Guadalupe with any promises or benefits for her testimony, including promises regarding her citizenship. (RT 1257.) He attempted at that time to locate Petitioner and Tony but was unable to do so. (RT 1258.)

Ruben Gama, a San Diego County District Attorney Investigator, testified that he met with Guadalupe a number of times in late 2012 and early 2013, in order to obtain copies of her immigration documents. (RT 1262-66.) He said Guadalupe first applied for a U-visa on October 1, 2012, and he denied making any promises or representations to her about helping her obtain a U-visa. (RT 1266, 1269.)

Stephen Shebloski, a San Diego Police Officer, testified that on July 19, 2011, he and Detective Tagaban were assigned to investigate this case, which was considered a cold case because it was seven years old, after a "CODIS hit" identified Petitioner as a suspect. (RT 1333-34.) He met with Guadalupe but did not make any promises or offer any benefits for her testimony. (RT 1326.) Officer Shebloski said a U-visa is a tool law enforcement uses which allows undocumented alien crime victims to temporarily avoid deportation, but he did not assist Guadalupe with applying for a U-visa. (RT 1358-59.)

The defense called Alma Lomeli who testified that Guadalupe lied when she testified that she and Petitioner came to Lomeli's house after a dance. (RT 1493.) Gina Sanchez testified that Petitioner is the father of her four children and that she got into an argument with Guadalupe one night at a club over the fact that Petitioner gave them both flowers on Valentine's Day. (RT 1499-1501.) She said Guadalupe was Petitioner's lover in 1999-2000, and during that time they spoke often and had a good relationship. (RT 1501-02.)

16cv0987-BTM (BGS)

Arcadio Sandoval, Petitioner's cousin, testified that Guadalupe dated Petitioner for a couple of years in the 1998-2000 time frame. (RT 1512-13.) Arcadio accompanied Petitioner to Guadalupe's house at least ten times, where he occasionally slept on the couch while Petitioner and Guadalupe slept together in the bedroom, and said they were affectionate around each other. (RT 1513-14.) Shearly Rodriguez testified that she was friends with Guadalupe and they lived together for about nine months in 2000. (RT 1528-30.) She and Guadalupe went dancing and occasionally ran into Petitioner, and when they did, he and Guadalupe sometimes left the dance together and she did not come home. (RT 1531.) She said Petitioner and Guadalupe never dated but were affectionate. (RT 1534.)

On March 15, 2013, after deliberating about seven hours, the jury found Petitioner not guilty on count two of kidnapping for rape, and not guilty on counts eight and nine of forcible rape and forcible sodomy relating to the second incident after Guadalupe was taken to the kitchen. (CT 720-37.) He was found guilty on count one of kidnapping for ransom, count three of assault with a firearm, count four of torture, counts five and seven of forcible rape and forcible sodomy during the first incident before Guadalupe was taken to the kitchen, and count six of forcible rape during the second incident after she was taken to the kitchen, and returned true findings on the sentence enhancement allegations. (Id.) On August 16, 2013, he was sentenced to life in prison on count one, plus consecutive terms of twenty-five years to life each on counts five and six, with an additional consecutive 40 years on the count five and six enhancements. (CT 743-45.)

Petitioner appealed, raising the same claims he presents here, alleging insufficient evidence to support the kidnapping for ransom count (claim one), failure to instruct on lesser included offenses of kidnapping (claim two), instructional error on the kidnapping for ransom count (claim thee), error in ordering consecutive sentences on the two rape counts because they were committed in close temporal and spatial proximity (claim four), the cumulative effect of the instructional errors on the kidnapping counts resulted in an unfair trial (claim five), and the failure to disclose to the defense the sealed immigration documents prevented meaningful appellate review (claim six). (ECF No. 9, attach. # 7.)

The appellate court: (1) granted relief on claim one because insufficient evidence was presented at trial to support the kidnapping for ransom conviction as there was no evidence Petitioner kidnapped Guadalupe for ransom, reward, or to extort something of value, remanded with instructions to enter a judgment of acquittal on that count, and found it unnecessary to reach the merits of claims two and three alleging jury instructional errors as to the kidnapping counts, (2) denied claim four because the two rapes occurred on separate occasions and consecutive sentences were appropriate, (3) rejected claim five because there could be no cumulative prejudice arising from the alleged jury instructional errors on the acquitted kidnapping counts, and (4) denied claim six after reviewing in camera the sealed immigration documents and finding no discoverable material and concluding that the trial court did not err in finding that disclosure to the defense was not appropriate. (ECF No. 9, attach. # 10, People v. Beltran, No. D064469, slip op. at 6-16.) Petitioner was resentenced to consecutive terms of 25 years to life each on the two rape convictions, plus 30 years on the enhancements. (ECF No. 9, attachs. # 13-14.)

On February 25, 2015, Petitioner filed a pro se petition for review in the state supreme court presenting the same claims raised here and on direct appeal. (ECF No. 9, attach. # 11.) The petition was denied with an order which stated: "The petition for review is denied." (ECF No. 9, attach. # 12, People v. Beltran, No. S224692, order at 1.)

## III.  **PETITIONER'S CLAIMS**

As previously noted, claims one through three were dismissed as moot because they challenge the kidnapping counts upon which Petitioner was acquitted. (See ECF No. 15.) In the three remaining claims, Petitioner alleges that: (1) the imposition of consecutive sentences for the two forcible rape counts violates California law because they were committed in close spatial and temporal proximity; (2) the cumulative effect of the jury instructional errors on the kidnapping counts resulted in an unfair trial; and (3) the failure of the trial court to disclose Guadalupe's immigration documents, which it reviewed in camera, violated his right to a record adequate to permit meaningful appellate review. (ECF No. 1 at 32-43.)

## IV. **DISCUSSION**

For the following reasons, the Court finds habeas relief unavailable because Petitioner has not demonstrated a federal constitutional violation.

### A. **Standard of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C. § 2254(a) (emphasis added).

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006). A state court's decision is "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court decision involves an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407. Relief is available under the unreasonable application clause "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." <u>White v. Woodall</u>, 572

U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011). To satisfy § 2254(d)(2), the factual findings upon which a state court's decision rests must be objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Even if § 2254(d) is satisfied, or if it does not apply, a petitioner must show a federal constitutional violation occurred in order to obtain relief. Fry v. Pliler, 551 U.S. 112, 119-22 (2007). A petitioner must also show that any federal constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing "most constitutional errors can be harmless.")

## B. Claim Four

Petitioner alleges in claim four that the imposition of consecutive sentences for the two forcible rape counts violates California law because they were committed in close spatial and temporal proximity. (ECF No. 1 at 32-38.) Respondent answers that federal habeas relief is unavailable as to this claim because it raises an issue of state law only, that to the extent it raises a federal issue state court remedies have not been exhausted, and is in any case without merit for the reasons given by the state appellate court in denying the claim. (ECF No. 18 at 12-13.)

Petitioner presented this claim to the state appellate and supreme courts in the exact same manner it is presented here. (ECF No. 9, attachs. # 7, 11.) The state supreme court summarily denied the petition for review in which it was raised. (ECF No. 9, attach. # 12, People v. Beltran, No. S224692, order at 1.) The appellate court denied the claim, stating:

> The trial court sentenced defendant to consecutive life sentences on the count 5 and 6 forcible rapes offenses, reasoning that the count 6 offense "was not committed in close temporal and spatial proximity to the offenses in counts 5 and 7." The court reasoned: "After committing the offenses charged in counts 5 and 7 in one of the bedrooms of the house where the victim was taken and held against her will by the defendant and others, the defendant left the bedroom while the victim remained in the bedroom. (¶) Some short time thereafter, the defendant ordered the victim to cook for the victim and the others in the house. After cooking, as ordered, (Guadalupe) cleaned up for

these men as ordered. (¶) Once this was completed, the defendant took the victim, once again, against her will, to another separate bedroom in the house, where he committed count 6. (¶) As a result, the offenses in count 6 occurred on a separate occasion than the offenses charged in counts 5 and 7. Accordingly, a separate custodial term from counts 5 and 7 may be imposed as to count 6."

Defendant contends his multiple one-strike sentences violated former section 667.61, subdivision (g) because the forcible rape and forcible sodomy offenses of counts 5, 6 and 7 were committed in close temporal and spatial proximity to each other, though the "events played out over several hours." He maintains the sentence is unauthorized under *People v. Jones* (2001) 25 Cal.4th 98 (*Jones*) and *People v. Fuller* (2006) 135 Cal.App.4th 1336 (*Fuller*).

Section 667.61, also known as the "One Strike" law, provides for indeterminate terms of 25 or 15 years to life for certain forcible sex offenses committed under aggravating circumstances. (§ 667.61, subds. (a) & (b).) The aggravating circumstances include kidnapping that substantially increased the risk of harm to the victim. (*Id.,* subd. (d)(2).) Before its 2006 amendment, section 667.61 subdivision (g) [footnote: Section 667.61 was amended in 2006, after the crimes in this case occurred (Stats. 2006, ch. 337, §33] stated that a One Strike sentence "shall be imposed on the defendant once for any offense or offenses committed against a single victim during a *single occasion.*" (Italics added.) The statute does not define the phrase "single occasion" and it does not set out criteria for determining whether multiple counts were committed on a single occasion.

In *Jones, supra,* 25 Cal.4th 98, the California Supreme Court held that the phrase "a single occasion" for purposes of then section 667.61, subdivision (g), meant the sex offenses "were committed in close temporal and spatial proximity." (*Jones,* at p. 107.) There, the defendant's sex crimes (one count of oral copulation and rape and three counts of sodomy) were committed in the backseat of a car over an hour and a half. (*Id.* at p. 101.) The court concluded that a single One Strike sentence should be imposed because the sexual assaults "occurred during an uninterrupted time frame and in a single location." (*Id.* at p. 107.) In *Fuller, supra,* 135 Cal.App.4th 1336, the Court of Appeal held that the imposition of three One Strike sentences for three acts of rape against a single victim was improper in a situation where the defendant raped the victim twice in her bedroom, both got dressed and went into the living room, but as he was preparing to leave, he raped the victim again. (*Id.* at p. 1339.) The defendant had stayed in the apartment over an hour before forcing the victim to drop him off where he had kidnapped her. (*Id.* at p.

1339.) The court reasoned: "All three rapes occurred within about an hour while both (the defendant) and Ms. L. remained inside her apartment. The only movement was the short distance from her bedroom to the living room. Defendant kept Ms. L. under his continuous and uninterrupted control during the entire time of the incident. Thus, there was a close temporal and spatial proximity between the three offenses. Accordingly, we vacate the sentence and remand for resentencing." (*Id.* at p. 1343.)

Defendant contends that *Jones* and *Fuller* require us to conclude that the forcible rape of Guadalupe in count 5 was committed on the same occasion as the forcible rape in count 6, because they occurred in the same house and were separated only by a "short interval" that occurred when Guadalupe cleaned the kitchen and cooked food for defendant and the other men. The contention is unpersuasive. Guadalupe's testimony makes clear that the two rapes did not occur during an uninterrupted timeframe, or while Guadalupe was in defendant's continuous and uninterrupted control. Though the two rapes occurred in the bedroom of the house, unlike in *Jones* and *Fuller,* an appreciable break in the events in this case occurred when Guadalupe was left undisturbed while defendant slept, and then forced into the kitchen to clean and cook for the men. Guadalupe testified that between the first rape and her second rape, some of the men went to the grocery store to purchase food, and defendant left the kitchen at some point. This interruption distinguishes *Jones* and *Fuller*. Further, defendant admits the kidnapping took place over the course of several hours, and though Guadalupe's testimony is not exact as to how many hours she was away from her home, the duration of her overall captivity was longer than the incidents in *Jones* and *Fuller*. We conclude there is substantial evidence to support the trial court's finding that the rapes did not occur on a single occasion, and thus it properly imposed a One Strike sentence for count 6.

(ECF No. 9, attach. # 10, <u>People v. Beltran</u>, No. D064469, slip op. at 11-14.)

Petitioner did not identify a federal constitutional basis for this claim in his pro se federal habeas Petition (ECF No. 1 at 32-38), did not do so in his pro se petition for review in the California Supreme Court (ECF No. 9, attach. # 11 at 44-48), and did not do so in the briefs filed by his attorney in the state appellate court (ECF No. 9, attach. # 7 at 42-46; ECF No. 9, attach. # 9 at 17). The Court must construe pro se prisoner petitions liberally, and liberal construction is especially important with regard to the determination as to which claims are presented. <u>Zichko v. Idaho</u>, 247 F.3d 1015, 1020 (9th Cir. 2001). However,

under even the most liberal construction of his petitions Petitioner has not identified a federal basis to challenge the consecutive sentences. Thus, he is not entitled to federal habeas relief. See 28 U.S.C. § 2254(a) ("a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.")

Furthermore, even were the Court to allow Petitioner to amend his Petition to allege a violation of his federal constitutional rights arising from the imposition of consecutive sentences on the two rape counts, any such claim would necessarily fail. The Supreme Court has stated that the decision by a state court to run sentences consecutively does not implicate the federal Constitution. Oregon v. Ice, 555 U.S. 160, 171 (2009). The Court recommends denying habeas relief as to claim four.

### C.   Claim Five

Petitioner alleges in claim five that the cumulative effect of several jury instructional errors resulted in an unfair trial. (ECF No. 1 at 38-39.) The errors identified are: (1) the omission of an element of kidnapping for ransom that the victim was kidnapped for purpose of extracting a valuable thing from another person, and (2) the failure to instruct the jury on lesser included offenses on the two kidnapping counts. (Id.) Respondent argues that the claim has no merit because the state appellate court reversed the kidnapping for ransom conviction and Petitioner was found not guilty on the kidnapping for rape count, and any instructional errors on those counts could have no prejudicial effect. (ECF No. 18 at 15.)

Petitioner presented claim five to the state appellate and supreme courts in the same manner presented here. (ECF No. 9, attachs. # 7, 11.) The state supreme court summarily denied the petition for review. (ECF No. 9, attach. # 12, People v. Beltran, No. S224692, order at 1.) The state appellate court reversed the conviction on kidnapping for ransom on the basis that sufficient evidence was not presented to support the element that Petitioner "kidnapped Guadalupe for ransom, reward, to extort property, or to exact from a third person money or a valuable thing." (ECF No. 9, attach. # 10, People v. Beltran, No.

16cv0987-BTM (BGS)

D064469, slip op. at 6-11.) The court remanded with instructions to acquit Petitioner on that charge, and then stated: "Given our conclusion that the count 1 kidnapping offense is unsupported by the evidence, we need not decide defendant's claims of instructional error related to that offense, including instructions on lesser included offenses." (Id. at 11.) The state appellate court then denied the cumulative error claim, stating:

> Defendant contends the trial court's errors cumulatively deprived him of due process and a fair and impartial trial, requiring reversal of the judgment. We have found merit to defendant's sufficiency of the evidence challenge, but conclude no other error occurred. Under the circumstances, there is no cumulative prejudicial error.

(Id. at 14.)

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973). Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).

The instructional errors identified by Petitioner relate only to the two kidnapping counts, and he was acquitted on both counts. Thus, if instructional errors occurred with respect to the kidnapping counts, they could not have prejudiced him, individually or cumulatively, because he was acquitted on those counts. Although he has not included any other trial errors in this claim, even assuming he could be allowed to amend his Petition to allege cumulative error with respect to any and all trial error claims, the claim would still fail. The only other errors alleged are in claim six where he argues the trial court erred in failing to disclose the sealed immigration documents to the defense, which as discussed below this Court finds was not error, and claim three where he argues sentencing error, where again the Court finds no error. Accordingly, the Court recommends denying habeas relief as to claim five, alleging that the combined effect of the trial court errors violated federal due process because they rendered the trial fundamentally unfair.

### D.    Claim Six

Petitioner alleges in his final claim that the failure of the trial court to disclose the sealed documents from Casa Cornelia Law Center regarding Guadalupe's attempt to obtain immigration assistance, which the trial court reviewed in camera and found contained material protected by the attorney-client privilege, violated his right to a record adequate to permit meaningful appellate review.  (ECF No. 1 at 40-43.)

Respondent answers that: (1) this claim relies only on state law, as there is no federal constitutional right to discovery in a state criminal trial; (2) the state trial and appellate courts reviewed the material in camera and there is no basis to find that nondisclosure adversely affected Petitioner's rights; (3)  any error is harmless because Guadalupe admitted during her trial testimony that she had entered the United States illegally and had been deported several times, at least once because of a conviction for possession of drugs for sale, and there is no showing that the sealed documents contained any information which would have assisted the defense in impeaching her; and (4) granting federal habeas relief on such a claim would constitute a new rule of criminal procedure prohibited by Teague v. Lane, 489 U.S. 288 (1989).  (ECF No. 18 at 13-15.)

Petitioner presented this claim to the state appellate and supreme courts in the same manner it is presented here.  (ECF No. 9, attachs. # 7, 11.)  The state supreme court summarily denied the petition for review in which it was raised.  (ECF No. 9, attach. # 12, People v. Beltran, No. S224692, order at 1.)  The state appellate court denied the claim, stating:

> Before trial, defense counsel sought information as to whether Guadalupe had obtained from the district attorney any promises of immigration relief in the form of either a "U-visa" that would allow her to remain in the United States as a crime victim, or some other favorable consideration.  The district attorney's office was then in the process of obtaining Guadalupe's immigration file to determine if it contained discoverable *Brady*-type material.  [Footnote: Defense counsel referred to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), but acknowledged that *Brady* did not strictly apply to the situation.  The trial court observed that the circumstances did not implicate *Brady* because the immigration records were

not in the People's possession, and thus the People had no obligation to produce them to the defense. Defense counsel was aware that in 2004, Guadalupe had obtained information about a U-visa from a police detective who had recommended she go through the process to remain in the U.S., that Guadalupe had made efforts to obtain such a visa via an organization called Casa Cornelia, that district attorney investigators had engaged in discussions with her concerning the status of her efforts, and that Guadalupe was denied such a visa in 2004 when she first made her application. Counsel sought to impeach Guadalupe with her motives in claiming she was a crime victim with regard to defendant.] The trial court eventually obtained the documents and informed counsel it would conduct an in camera review, and it later ordered them placed under seal at the conclusion of the case.

Asserting this court has a "constitutional responsibility to review trial court decisions where important rights are concerned," defendant asks that we independently review the sealed records to determine if any of the documents or other materials were discoverable, and whether the court properly withheld disclosure of any documents or information. We have done so, and conclude the trial court neither abused its discretion in finding none of the materials was discoverable and that disclosure of the information was not appropriate, nor did the court violate any "important" right. (See, e.g., *People v. Myles* (2012) 53 Cal.4th 1181, 1209 (applying abuse of discretion standard).)

(ECF No. 9, attach. # 10, <u>People v. Beltran</u>, No. D064469, slip op. at 14-15.)

Petitioner has failed to identify what clearly established federal law was violated by the trial court[1] in sealing Guadalupe's attorney-client privileged Casa Cornelia Law Center file after reviewing it in camera and determining that the defense was in possession of most of the documents contained therein and the remaining documents would not aid the defense in its attempt to impeach Guadalupe. Petitioner appears to rely on the proposition that he has a federal constitutional right to an appellate record sufficient to provide meaningful appellate review. He appears to argue that his right to a meaningful appellate review was,

---

[1] To the extent Petitioner challenges the manner in which the state appellate or supreme courts treated the sealed documents on appeal, as opposed to the trial court's handling of the documents, he has not stated a claim cognizable on federal habeas. <u>See</u> <u>Franzen v. Brinkman</u>, 877 F.2d 26, 26 (9th Cir. 1989) (holding "that a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings.")

or potentially was, violated by the defense not having the opportunity to determine for itself whether the Casa Cornelia Law Center file contained immigration documents with impeachment value.

The United States Supreme Court has held that although the States have no federal constitutional obligation to provide appellate review of criminal proceedings, once such review is provided, a record which is not sufficient to permit adequate and efficient appellate review can infringe upon federal constitutional rights. See Griffin v. Illinois, 351 U.S. 12, 18-20 (1956) (holding that denial of free trial transcripts to indigent defendants violated due process and equal protection); Parker v. Dugger, 498 U.S. 308, 321 (1991) (stating that the court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally."); see also United States v. Herrera-Blanco, 232 F.3d 715, 718 (9th Cir. 2000) (holding that where a defendant was able to and did collaterally attack the validity of a deportation order during his criminal proceedings, the limitation on doing so again in collateral proceedings imposed by AEDPA did not violate "his constitutional right to meaningful appellate review of his due process claim.")

Petitioner has not identified any "clearly established federal law" within the meaning of 28 U.S.C. § 2254(d)(1) to support this claim, because he has not shown that the United States Supreme Court has applied the constitutional right to meaningful appellate review to his situation, where attorney-client privileged documents were reviewed in camera by the trial court, sealed for appellate review, and not disclosed to the defense. See Woodall, 134 S.Ct. at 1706-07 (holding that "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not 'clearly established at the time of the state-court decision.'"), quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004). Although § 2254(d)(1) does not require an "identical factual pattern before a legal rule must be applied," Panetti v. Quarterman, 551 U.S. 930, 953 (2007), relief under that provision is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."

16cv0987-BTM (BGS)

Woodall, 134 S.Ct. at 1706-07, quoting Richter, 562 U.S. at 103.  Such an extension is not obvious here because the Supreme Court has held that in camera review of sealed material can protect a defendant's federal constitutional rights.  See e.g. Pennsylvania v. Ritchie, 480 U.S. 39, 59-60 (1987) (holding that a defendant's right to a fair trial was secured by submitting privileged documents for in camera review, and stating that "[d]efense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.")[2]  The Court finds that Petitioner has not satisfied 28 U.S.C. § 2254(d)(1).

Even to the extent Petitioner could satisfy § 2254(d)(1), or argue that he should be excused from being required to satisfy § 2254(d)(2) because he is not privy to the factual findings upon which the state court decision rests, he is still not entitled to federal habeas relief unless he can establish that a federal constitutional violation occurred.  See Fry, 551 U.S. at 119-22 (holding that even if § 2254(d) is satisfied, or does not apply, a petitioner must show a federal constitutional violation occurred in order to obtain federal habeas relief).  Prior to examining the merits of the claim, however, the Court must first address Respondent's argument that relief is barred by Teague.  See Caspari v. Bohlen, 510 U.S. 383, 389 (1994) (noting that when a respondent raises a Teague issue, the Court must apply Teague before addressing the merits of the claim).

In Teague the court held that that a constitutional rule of criminal procedure which "breaks new ground or imposes a new obligation on the States," or "was not dictated by precedent existing at the time defendant's conviction became final," do not apply

---

[2]   The Supreme Court has suggested that in camera review can be inadequate where large volumes of complex electronic surveillance records are obtained without probable cause, but was careful to distinguish that case from other sealed proceeding cases.  See Alderman v. United States, 394 U.S. 165, 182 (1969) ("In both the volume of material to be examined and the complexity and difficulty of the judgments involved, cases involving electronic surveillance will probably differ markedly from those situations in the criminal law were in camera procedures have been found acceptable to some extent.")  Here, by contrast, the defense was already in possession of the majority of the documents contained in the sealed records, which consisted of the victim's legal file of an advocacy group assisting her in obtaining immigration relief.

retroactively to cases on collateral review unless they fall into one of two narrow exceptions. Teague, 489 U.S. at 301. The exceptions are rules placing private conduct beyond the power of criminal law to prohibit, id. at 307, and "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceedings." Saffle v. Parks, 494 U.S. 484, 495 (1990), quoting Teague, 489 U.S. at 311.

As discussed above, there is no clearly established United States Supreme Court precedent supporting relief on this claim within the meaning of § 2254(d)(1), which supports Respondent's contention that this claim seeks to apply a new rule under Teague. See Williams, 529 U.S. at 412 ("whatever would qualify as an old rule under our Teague jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1).") However, when applying Teague, unlike § 2254(d)(1), the Court may consider Ninth Circuit authority. Burton v. Davis, 816 F.3d 1132, 1142 (9th Cir. 2016). Although the Ninth Circuit has recognized that constitutional issues may arise from the denial of access to the defense of an informant's identity based solely on danger to the informant without balancing the needs of the defense, see United States v. Ordonez, 722 F.2d 530, 540 (9th Cir. 1983), there is no indication that has been extended that to the context of the type of documents at issue here. See United States v. Hernandez-Escarsega, 886 F.2d 1560, 1581 (9th Cir. 1989) ("[C]ourts have the inherent power to receive in camera evidence and place it under seal in appropriate circumstances.") Thus, the rule Petitioner seeks, that sealing for appellate review of attorney-client privileged documents relating to possible impeachment evidence after an in camera review does not provide an adequate appellate record, constitutes a new rule of criminal procedure under Teague.

The new rule Petitioner seeks to apply does not fall into either narrow Teague exception because it would not place private conduct beyond the power of criminal law to prohibit, and is not the type of procedure implicit in the concept of ordered liberty without which the likelihood of an accurate conviction is seriously diminished. Caspari, 510 U.S. at 390. Thus, even assuming Petitioner could satisfy 28 U.S.C. § 2254(d)(1) or (2), or

show that those provisions do not apply, and assuming he could demonstrate a federal constitutional violation occurred, relief on this claim is barred by <u>Teague</u>.

Finally, even were the Court to address the merits, it would find, consistent with the Supreme Court, <u>see</u> <u>Ritchie</u>, 480 U.S. at 59-60, and the Ninth Circuit, <u>see</u> <u>Hernandez-Escarsega</u>, 886 F.2d at 1581, that Petitioner's federal constitutional rights were adequately protected by the trial court's in camera review of the privileged documents and then sealing them for appellate review. The Court recommends denying habeas relief as to Claim Six.

## V. **CONCLUSION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **July 18, 2018**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 1, 2018.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated: June 18, 2018

Hon. Bernard G. Skomal
United States Magistrate Judge

16cv0987-BTM (BGS)